## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| B-KAM, LLP, *a North Dakota Limited Liability Partnership*, | Civil No. 08-5168 (JRT/LIB) |
| Plaintiff, | |
| v. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| CORA FLODING and RUTH FLODING, *individually and as Successor Trustees of the Harry W. Floding Trust*, | |
| Defendants. | |

Scott T. Johnston, **JOHNSTON LAW OFFICE, P.A.**, Easton Place, 510 22nd Avenue East, Suite 101, Alexandria, MN 56308, for plaintiff.

Andrew P. Elsbecker, 1361 Hampshire Avenue South, St. Louis Park, MN 55426, for defendants.

## FINDINGS OF FACT

1.      All of the Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

2.      To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

3.      Ruth D. Floding, in her individual capacity, and Harry W. Floding Trust ("Floding Trust") were the former record fee simple owners of real estate in Douglas County, Minnesota ("Floding Resort").  Cora Floding is the daughter of Ruth Floding.

Collectively with the Floding Trust, Cora and Ruth are defendants in this action ("defendants"). Cora Floding's sons are Joshua and Jonathan Lord.

4.      On October 18, 2001, Ruth Floding and the Floding Trust obtained a mortgage loan from American National Bank for $810,000.

5.      Thereafter, defendants defaulted on the loan, and on December 8, 2003, the interests of Ruth Floding and Floding Trust were foreclosed upon and a Sheriff's Certificate was issued subject to a twelve-month right of redemption. The Certificate of Redemption was issued to the Floding Trust.

6.      Lee-Breitbach LLP, a Minnesota limited liability partnership, purchased the Sheriff's Certificate on December 8, 2003 for $1,000,000 at the sheriff's sale subject to the twelve-month redemption period.

7.      On or about November 29, 2004, B-Kam, LLP ("B-Kam" or "plaintiff") was registered with the North Dakota Secretary of State. The registration identified Tim Christian as managing partner and John Ysteboe as partner. John Ysteboe is no longer a partner in B-Kam.

8.      In 2004, Cora Floding hired James Brown of Gateway Financial Services, Inc. ("Gateway") to aid them in finding financing to enable defendants to redeem the Sheriff's Certificate from Lee-Breitbach, LLP. To that end, Brown contacted Tim Christian who was sent a Commercial Loan Write-Up dated October 17, 2004, in which defendants requested a loan of $1,250,000 to refinance the Floding Resort.

9.      Just prior to Christian receiving the Commercial Loan Agreement, on October 21 and 22, 2004 defendants obtained building permits enabling them to construct

eight new cabins on the Floding Resort.  On or about October 11, 2004, Rick Maras, a general contractor and long-term partner of Cora Floding, and Joshua Lord removed the old cabins on the Floding Resort, poured five cement slabs for new cabins, began framing at least three cabins, and attached sewer lines for all eight cabins.  Tim Christian first visited the Floding Resort on October 22, 2004, and testified to his surprise that the old cabins had been demolished.

10.     On November 17, 2004, plaintiff's Certified Public Accountant ("CPA") contacted Douglas A. Christensen, then-attorney for plaintiff, to discuss the Commercial Loan Write-Up and the legal ramifications of entering into such an agreement.  On November 18, 2004, Christensen contacted Lee-Breitbach, LLP inquiring whether it would sell the Sheriff's Certificate in order to eliminate various judgment liens existing against defendants.  Lee-Breitbach, LLP refused to sell the Sheriff's Certificate at that time.

11.     On or about November 20, 2004, attorney John Hatling was hired by defendants to conduct a closing on mortgage loans from plaintiff in anticipation of signing the Commercial Loan Write-Up.  To that end, on November 22, 2004, Hatling sent Christensen a set of mortgage loan documents.  However, on or about November 24, 2004, B-Kam determined, after consultation with its attorney and CPA, that it was not interested in lending money to defendants to be secured by a mortgage for business reasons, including Minnesota's protections to mortgagors from creditors enumerated in Minnesota's foreclosure laws.

12.     Between November 24 and 29, 2004, a Warranty Deed, Bill of Sale, the

Floding Resort Lease Agreement ("Floding Resort Lease"), and an Agreement for Loan

of Money to Redeem Real Property Conveyance of Real and Personal Property, For

Cabin Construction Loan and for Lease of Real and Personal Property ("Redemption

Loan") were drafted for signature by defendants.   The documents were signed on

November 29, 2004 by defendants in favor of B-Kam.

13.     The Floding Resort Lease Agreement provided for monthly payments in the

following amounts

| Month | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| January | None | $1500 | $3,500 | $3,500 |
| February | None | $1500 | $3,500 | $3,500 |
| March | None | $1500 | $3,500 | $3,500 |
| April | None | $1500 | $3,500 | $3,500 |
| May | None | $3,500 | $3,500 | $3,500 |
| June | None | $36,500 | $36,500 | $39,000 |
| July | None | $33,500 | $33,500 | $33,500 |
| August | None | $33,500 | $33,500 | $33,500 |
| September | None | $26,500 | $26,500 | $33,500 |
| October | None | $3,500 | $3,500 | $3,500 |
| November | None | $3,500 | $3,500 | $3,500 |
| December | $2600 | $3,500 | $3,500 | $3,500 |

14.     The Floding Resort Lease also contained an "Option to Purchase Premises"

("the Option") whereby so long as defendants were not in default of any obligation or

duties imposed by the lease, they could purchase the Floding Resort during the term of

the lease.  The Option provided that in 2005, the purchase price would be $1,200,000, in 2006 it would be $1,320,000, and in 2007 it would be $1,452,000.

15.     The Redemption Loan provided that B-Kam would purchase the real property and Floding Resort property from defendants for $1,200,000.  B-Kam would then wire $1,200,000 to Integrity Title, Inc., in Alexandria, Minnesota, and the funds would be used by defendants to: redeem the real property from the Sheriff of Douglas County or Lee-Breitbach, LLP; pay all of the unpaid real estate taxes levied and assessed against the real property; pay for all the judgments which were liens against the real property; and pay all the costs and expenses required to complete the redemption and sale of the real property.  This arrangement was necessary because defendants held the right to the Certificate of Redemption, allowing them to redeem the real property.

16.     However, B-Kam did not send the money to Integrity Title, Inc.  Instead, on December 6, 2004, B-Kam directly paid Lee-Breitbach, LLP $1,091,908.80 to redeem the Sheriff's Certificate, which Wayne Lee of Lee-Breitbach, LLP executed on that day in favor of defendants.  B-Kam also paid $38,552.28 in real estate taxes, $3603.30 in deed tax, $49 to record the transaction, and $18,000 for James Brown's fee.  In total, B-Kam paid $1,152,113.82 of the originally agreed $1,200,000.

17.     B-Kam also required as an additional condition for providing the necessary funds for defendants to redeem the Sheriff's Certificate that defendants agree to pay $73,150 as an "Origination Fee."  This was agreed to both in the Redemption Loan and in a subsequent promissory note signed on December 1, 2004.  The Origination Fee

provided for monthly payments of $2,000 from January to May 2005, $15,000 per month from June to September 2005, and a final payment of $7,556.13 in October 2005.

18.    While negotiating the Redemption Loan, defendants also sought an additional loan from B-Kam to build the eight new cabins for which defendants acquired building permits in October.  In connection with that request, the parties executed an Agreement for Loan of Money to Construct (8) Eight Cabins ("First Cabin Construction Loan") and a Cabin Construction Promissory Note that by its terms was effective as of January 2, 2005, and was signed on or about January 14, 2005.  As security for the repayment of the note, B-Kam executed a Security Agreement, also with an effective date of January 2, 2005.  B-Kam perfected the security interest as granted in the Security Agreement by filing a UCC Financing Statement on August 25, 2005 in the Office of the Douglas County Recorder, and a UCC Financing Statement in the Central Filing Office of the State of Minnesota on September 5, 2008.

19.    Through the First Cabin Construction Loan, B-Kam agreed to provide up to $263,000 in construction funding on an as-needed basis.  All construction invoices were subject to approval by B-Kam or its duly-authorized representative.  The First Cabin Construction Loan set forth three conditions to payment: (1) defendants were to provide a list of contractors doing work on the property; (2) they were to provide a list of suppliers; and (3) they were to provide lien waivers for the work performed prior to each payment. The First Cabin Construction Loan provided that the borrower would be in default if one or more of the following were to occur: the Borrower failed to pay the principal and interest as and when required under the Loan's terms; the Borrower failed to make a lease

payment or failed to pay any other sum required under the provisions of the Floding Resort Lease Agreement; the Borrower failed to make a payment of the principal and interest under the promissory note for the Origination Fee; or the Borrower failed to perform any of the other conditions set forth in the First Cabin Construction Loan.

20.     During the Spring of 2005, B-Kam agreed to make another loan to defendants when it became apparent that the cost of construction would exceed the $263,000 of the First Cabin Construction Loan.   Thus, defendants executed another promissory note ("Second Cabin Construction Loan") on May 10, 2005, in the principal amount of $165,000, in favor of B-Kam.   The Security Agreement and Financing Statements secured the repayment of the Second Cabin Construction Loan.

21.     On July 29, 2005, Christensen sent defendants a letter detailing the amount of money owed to B-Kam, and describing the failures to remit appropriate payment as potential "defaults" under the various agreements and notes.

a.     **Floding Resort Lease Agreement**: defendants failed to make monthly payments for April 2005 through August 2005 totaling $108,500.

b.     **Origination Fee**: defendants failed to pay the monthly principal or interest payments such that at the time of the letter the remaining unpaid principal sum was $57,633.74, plus accrued interest

c.     **First Cabin Construction Loan**: at the time of the letter, defendants owed the principal sum of $261,671.08 of the original $263,000 loan, plus accrued interest.

d.   **Second Cabin Construction Loan**: at the time of the letter, defendants had made no payments towards the $165,000 principal, and it was continuing to accrue interest.

The letter stated that the failure to pay the sums requested before August 12, 2005, would result in B-Kam commencing an action for eviction of defendants from the Floding Resort.

22.   On Thursday, August 11, 2005, defendants received approval for a home mortgage for up to $2,000,000 from Commonsense Mortgage, Inc.  The approval was subject to the following conditions: (1) sufficient funds to close; (2) acceptable appraisal on the subject property; (3) marketable title; (4) no material changes in employment, credit rating, or current debt obligations of the borrower; and (5) final review by an underwriter.  That day, Todd Roth, an attorney for defendants, faxed the approval to Tim Christian of B-Kam and Christensen, plaintiff's attorney, with a note saying "Per Cora: (1) Commonsense Mort. wants to talk with me Monday before they commit . . . ."

23.   On Monday, August 15, 2005, Christensen sent defendants a letter stating that as of that day, and despite payments made on April 11 and May 5, 2005, defendants failed to pay the June, July, and August rent payments, totaling $103,500.  Thus,

> [p]ursuant to paragraph 17 of the Floding Resort Lease B-KAM, LLP as landlord has the option to pursue any one or more of the remedies set forth therein upon five (5) days written notice and demand.  Based upon the foregoing, this is to advise you, Ruth Floding and Cora Floding, who are named as the tenants under the Floding Resort Lease that B-KAM, LLP, as landlord, has and does herewith elect to **terminate** the lease and your rights thereunder as tenants.  The Floding Resort Lease and your rights as tenants thereunder will terminate at **Midnight, August 22, 2005**.

Christensen testified that in his opinion, the effect of the of the letter was to advise defendants that B-Kam terminated the lease and their rights under the lease as tenants, and that they must vacate the premises by midnight or B-Kam would start an eviction action.  Christensen also testified that it was his intention that by terminating the rights under the lease, the letter would also terminate the Option contained in the Floding Resort Lease.

24.    On August 19, 2005, defendants' attorney Roth sent a letter asserting that defendants were "ready, able and willing to pay off the required sums due as evidenced by the Common Sense [sic] Mortgage, Inc. loan approval . . . ."  Roth also stated that Ruth and Cora Floding disputed the $73,150 Origination Fee, the $263,000 First Cabin Construction Loan, and the $165,000 Second Cabin Construction Loan as "inaccurate sums . . . [because] they have not received the full proceeds of the loans . . . ."  Thus they requested an accounting of all monies disbursed under the loans so that an accurate pay-off could be calculated.   Roth also asserted that the written notice and demand by B-Kam failed to account for Minnesota law requiring at least one month's notice.  Contrary to defendants' assertions, the Origination Fee was not a loan, but was instead a fee guaranteeing the performance of B-Kam in redeeming the Sheriff's Certificate from Lee-Breitbach, LLP.

25.    Christensen sent a letter to Roth and defendants on August 23, 2005, first stating that he did not receive the Friday, August 19 letter until Monday, August 22 as he had been out of the office.  The letter provides as follows:

Under the column **Lease**, the sum of [$12,100] has been received as lease payments. As you can see there have been no payments made for the months of June, July, or August.

Under the heading **[First] Cabin Construction Loan,** they have made $9,000 of payments.

Under the heading, **First [Redemption] Loan**, you can see they've made payments of $25,000.

B-Kam has funded $261,743.62 of the Cabin Construction Loan . . . the balance of the money was not advanced for the principals of B-KAM learned that Cora Floding was using some of the money . . . to pay for improvements to her home . . . [which was] contra to the loan agreement . . . . B-KAM [has also] advanced $143,500 [on the Second Cabin Construction Loan] . . . [but] B-KAM chose to discontinue any further advances because the Flodings failed to pay the June rent payment required to be paid under the lease . . . .

26.     Despite the Commonsense Mortgage, Inc. Loan Approval document referenced earlier, the actual mortgage financing commitment eventually came from a different company, Second Chance Investments, LLC ("SCI"), in a letter on August 23, 2005. SCI agreed to provide a maximum of $2,000,000, with a term of fifteen months, at ten and a half percent interest, payable monthly. The SCI mortgage financing commitment also required an origination fee of $150,000, to be paid at the time of closing the loan. Finally, SCI required that an "ALTA" survey, which is a highly detailed survey, be done of the Floding Resort for SCI, and for the title insurance company.

27.     Jody Schimek, owner of Alexandria Title, was brought into the transaction to provide title insurance and an escrow account. On September 1, 2005, Schimek faxed a proposed HUD Settlement Statement to Roth. The Settlement Statement set forth the various amounts of money due from defendants, including $605,505 to clear title as to

creditors and lien claimants. Later, a Second Settlement Statement was prepared and faxed to defendants' attorneys on October 20, 2005, in which the amount of cash required from defendants to close the transaction was determined to be $239,886.55. Schimek testified that she never received this amount of money, and did not believe that at any point defendants had such a sum to bring to a closing.

28. Schimek testified that she met with Ruth and Cora Floding on September 2, 2005, for the purpose of having Ruth sign the proposed loan documents from SCI. The purpose of the execution of the loan documents was to receive the $2,000,000 loan proceeds into her escrow account. Schimek testified that the meeting was in the nature of an "escrow" closing, but was not a closing as to any transaction between defendants and B-Kam. She testified that B-Kam was not contacted to attend the meeting.

29. On September 2, 2005, defendants signed documents to allow a lender to deposit loan proceeds into Alexandria Title's escrow account. The Escrow Agreement contained a number of conditions, the failure of any one of which would preclude defendants from receiving the loan. One such condition was the procurement of the ALTA survey. The Escrow Agreement was needed because Schimek did not have "payoffs" from defendants on the mechanics liens, or the judgments against the property. The Escrow Agreement also required a "break-up fee" of $20,000 from defendants, which would be held in the escrow account and would be paid to SCI in the event the loan financing deal did not close by September 23, 2005. A later amendment to the Escrow Agreement provided an additional $200,000 commitment, bringing the total

amount committed to $2,200,000.   However, it does not appear that the additional $200,000 was ever deposited into the escrow account.

30.     Between September 2 and September 28, 2005, defendants and B-Kam attempted to settle the dispute between them concerning the exercise of the Option.  As part of that process, Christensen sent a statement to defendants' attorneys providing that the amount owed as of September 8, 2005 was $1,823,043.53.   This amount represented the principle balance of the First Cabin Construction Loan, Second Cabin Construction Loan, the Origination Fee, a loan fee, the lease option, unpaid rent, legal fees, and interest.

31.     Schimek testified that on September 15, 2005, when it became apparent that the deal would not close before the September 23 deadline, SCI expressed willingness to extend the September 23, 2005 "drop-dead" date for thirty days upon payment of $25,000 as an extension fee, separate from the $20,000 break-up fee that was already in escrow.   On September 28, 2005, Christensen sent defendants' attorneys another letter, again detailing defendants' various defaults, and offering to sell the Floding Resort for $1,950,000 subject to all liens and encumbrances, and set the deadline for accepting such an offer as the next day, September 29, 2005.   The parties were ultimately unable to come to a settlement.

32.     A later communication from SCI on October 21, 2005, indicated that if SCI did not receive satisfactory evidence that defendants had at least $236,000, it would take no further efforts to close the loan, and would direct Alexandria Title to return all monies in the escrow accounts.   When defendants failed to provide the additional funds needed to

clear the liens and encumbrances on the Floding Resort, the loan commitment expired and the escrowed funds held by Alexandria Title, including the "break up fee," were wired back to SCI on October 25, 2005.

33.    Due to defendants' default and the inability of the parties to reach a settlement, B-Kam filed a Complaint for Eviction in Douglas County District Court ("2006 Eviction Action"), naming Ruth and Cora Floding as defendants.  Defendants filed an answer on January 5, 2006 in which they alleged that an equitable mortgage had been created between the parties.   A hearing was scheduled for January 11, 2006, however prior to the hearing the parties entered into a settlement relative to the equitable mortgage defense.  The parties read a stipulation into the record, which included:

a.    A judgment of eviction was to be issued, but stayed until October 11, 2006, and defendants had the right to occupy the property until that date regardless of whether rent was paid during that time, though rent would still be owed for that period of time.

b.    Plaintiff agreed to convey all of its interest in the real or personal property upon payment of $2,010,000, plus interest.

c.    Ruth D. Floding, in her individual capacity and as trustee of the Harry W. Floding trust, and Cora Floding acknowledged that the Floding Resort Lease Agreement is not and does not constitute an equitable mortgage, lien, or any other type of security interest which would require any type of judicial or statutory proceeding, the result of which would afford them any type or form of redemption rights such as those afforded a mortgagee or contract vendee.

d.    In the event either or both defendants failed to purchase the Floding Resort and the personal property associated therewith, said defendants would peacefully relinquish possession of the Floding Resort, and all of the personal property associated with it.

34.    Defendants' attorney questioned Cora Floding on the record regarding her understanding of the stipulation as it related to releasing claims of an equitable mortgage.

Q:    [I]f you can't get [appropriate] financing together you and your mother will be out of that property, do you understand that?

A:    Yeah.

Q:    And that date will be October 11 of 2006.

A:    Yes.

Q:    Now, you and I have discussed the concept of an equitable mortgage and how that might result in B-KAM having to bring what I referred to as a foreclosure by action, go through a publication and redemption period, and it could delay this process for up to 18 months by my estimate for them to get possession of the property, have we discussed that?

A:    Yes.

Q:    And do you understand that this is a compromise that we're entering into, that essentially we've divided that 18 months in half and you're getting nine months to October 11, 2006, to come up with the money to pay them off?

A:    Yes.

*    *    *

Q:    Do you have any questions about the stipulation that we've read into the record?

A:    No.

Q:    Are you willing to be bound by the terms of that?

A:    Yes.

*       *       *

Q:    And you're willing to have that be the law of this matter and abide by this stipulation?

A:    Yes.

35.    A Judgment of Eviction was entered on March 21, 2006, and a Writ of Recovery was personally served on defendants on October 23, 2006.   The Writ of Recovery directed the Sheriff of Douglas County, Minnesota, to immediately seize the Floding resort and evict defendants from the Resort, and take possession all of the personal property located there.   Despite the Writ of Recovery, B-Kam allowed defendants to remain in possession of the Floding Resort, on the condition that all rental payments be forwarded to B-Kam.   B-Kam alleged in a prior court action that allowing defendants to remain on the premises constituted an oral lease, Defendants denied that such a lease existed.

36.    On April 17, 2007, defendants divided their property into two parcels, Parcel A and Parcel B.   Two separate Purchase Agreements were then negotiated and executed between B-Kam, as seller, and two entities formed by defendants, named Floding Resort 1, LLC, and Floding Resort 2, LLC, with the intention of selling Parcel A to Floding Resort 1, LLC and Parcel B to Floding Resort 2, LLC.   However, defendants failed to complete the purchases as provided for in the Purchase Agreements and amendments by the designated deadline of June 1, 2007.

37.     Defendants subsequently paid B-Kam $90,920 between June 4, 2007 and November 28, 2007, to remain in possession of the Floding Resort.   Negotiations occurred between the parties regarding the lease of the Floding Resort for the 2008 resort season, but the parties were unable to come to an agreement.   No lease payment was made by defendants subsequent to November 28, 2007.

38.     On March 26, 2008, Ruth and Cora Floding, and Ruth Floding as Trustee of the Harry W. Floding Trust, filed a Summons and Complaint in District Court in Douglas County, Minnesota against B-Kam, asserting the equitable mortgage theory previously raised in the January 5, 2006 Answer and Memorandum.   Neither the Summons nor the Complaint was served on B-Kam.

39.     B-Kam initiated the second eviction against defendants in State District Court in Douglas County, Minnesota, in May 2008.   Defendants were personally served with a Summon and Complaint on May 30, 2008.   On July 8, 2008, the State District Court in Douglas County issued Findings of Fact, Conclusions of Law, and an order entering judgment determining that B-Kam was entitled to recovery of the Floding Resort.

40.     On July 3, 2008, defendants filed a Summons and Complaint in federal court raising claims that the Warranty Deed and the Floding Resort Lease constitute an equitable mortgage and asserting other claims against B-Kam.   Defendants also moved for a temporary restraining order and a preliminary injunction against B-Kam.   On August 8, 2008, this Court issued a temporary restraining order and scheduled a hearing for August 21, 2008 to consider whether to grant a preliminary injunction.   On

September 4, 2008, this Court denied the preliminary injunction and lifted the temporary restraining order, noting "that the Flodings intended to release their equitable mortgage claim.   Indeed, that intent was expressly verified on the record."   This Court subsequently dismissed the case due to the failure of defendants to personally serve the Summons and Complaint, and for lack of prosecution.

41.    On September 4, 2008, B-Kam caused the Writ of Recovery to be personally served on defendants.   Tim Christian testified that on the evening of September 4, 2008 he observed defendants removing numerous items of personal property from the Floding Resort that were owned by B-Kam by virtue of the Bill of Sale, and additional items of personal property on which B-Kam had a security interest by virtue of the Security Agreement from January 2, 2005.   B-Kam obtained the assistance of the Douglas County Sheriff's Department in temporarily preventing defendants from removing any additional such property, and B-Kam initiated the present action in state district court seeking the enforcement of the Bill of Sale and Security Agreement, and the collection of sums owing.   Defendants removed this action to federal court by notice of removal on September 11, 2008.

## CONCLUSIONS OF LAW

## I.    B-KAM'S CLAIMS

B-Kam claims that defendants breached the Floding Resort Lease by defaulting on their obligations to make lease payments, and further defaulted on their obligations under the Origination Fee, First Cabin Construction Loan, and Second Cabin Construction

Loan, by failing to make scheduled payments. Due to these defaults, B-Kam claims that the option to purchase contained in the Floding Resort Lease was extinguished. *Wurdemann v. Hjelm*, 102 N.W.2d 811, 820 (Minn. 1960) ("Where as here the lease and option agreements constitute a part of one entire contract, the breach of the lease amounts to a failure of consideration for the accompanying option to purchase, so that when the lease fails because of a breach of the covenants by the lessees the accompanying option must fail with it."). B-Kam seeks recovery of the principal and interest due on the promissory notes, and replevin of the personal property remaining at the Floding Resort at the time defendants were evicted.

### A.     Promissory Notes

There are three contracts on which B-Kam seeks recovery: (1) the First Cabin Construction Loan; (2) the Second Cabin Construction Loan; and (3) the Origination Fee.

B-Kam's First Cabin Construction Loan was for $263,000, the unpaid principal of which was to be charged interest at the annual rate of ten percent for the first twelve months of the note, eleven percent for the second twelve months, and twelve percent for the third twelve months, at which time the entire principal and unpaid interest was fully due and payable. B-Kam has shown that defendants paid a total of $10,525.00 during 2005, with no further payments thereafter. (Defs.' Trial Ex. 50.) B-Kam has further shown that of the initial principal sum, it advanced $261,743.62. (*Id.*) B-Kam states that the amount owing as of September 5, 2008, is $352,277.82, with interest accruing at the rate of $83.2041 per day subsequent to that date.

The Second Cabin Construction Loan was for $165,000, with interest thereon at the initial annual rate of twelve percent, rising to thirteen percent annually after November 5, 2005. B-Kam has shown that it funded $143,500 of the Second Cabin Construction Loan, and that defendants have not made any payments towards that loan. (*Id.*) B-Kam has shown that the amount owing as of September 8, 2005, is $204,547.90, with interest accruing at the rate of $51.1096 per day subsequent to that date.

Initially, when B-Kam agreed to provide sufficient funds to redeem the Sheriff's Certificate it required that an "Origination Fee" of $73,150 be paid, with interest thereon at the annual rate of ten percent per annum fixed. B-Kam has shown that defendants paid a total of $25,000 towards that promissory note, all in 2005, and have not made any payments since that time. (*Id.*) B-Kam has shown that the amount owing under the promissory note as of September 5, 2008, is $68,992.05, with interest accruing at the rate of $14.4204 per day thereafter.

Defendants' argument that B-Kam's payment of $1,152,13.38 instead of the full $1,200,000 agreed to in the Redemption Loan suggests a breach by B-Kam is without merit. Tim Christian and James Brown testified that not all judgments against defendants were paid at closing, as Roth was still trying to determine the amounts owing. The amounts eventually discussed, $56,800 and $58,460 (Pl.'s Trial Exs. 59-60) in late June 2004, demonstrate that the additional $47,886 initially promised by B-Kam was more than fulfilled in later payments. Further, B-Kam has shown that in addition to the above described disbursements made under the various notes, it has provided more than $131,000 in payments towards liens and other judgments related to the construction of

new cabins, upkeep of the property, and taxes.   (Pl.'s Trial Ex. 49.)   Defendants'
arguments that various payments characterized as "advances" should be deducted from
the amounts owing is unavailing, when B-Kam appears to have paid out more than the
principal agreed to in the loans.

The Court finds that defendants' owe B-Kam the amounts demanded in the
complaint, $625,817.77, plus accrued interest, because defendants' obligations under the
notes were clear and unambiguous, and defendants' defaulted by failing to pay the sums
owed according to the payment schedules set out in the various promissory notes.

## B.      Replevin

At trial, B-Kam advised the Court it was no longer seeking to recover any
additional equipment or personal property taken by defendants from the Floding Resort.
Instead, B-Kam only seeks to retain the personal property remaining at the Floding
Resort after defendants were evicted in September 2008.   A replevin action seeks to
regain possession of items.   *See Widgren v. Massie*, 352 N.W.2d 420, 425 (Minn. Ct.
App. 1984) (citing *Seebold v. Eustermann*, 13 N.W. 739, 745 (Minn. 1944)); *see also*
Minn. Stat. § 548.04 (2008) (A replevin action is "to recover the possession of personal
property . . . .").   A replevin judgment "may be for the possession [of the personal
property] or the value thereof in case possession cannot be obtained, and damages for the
detention, or the taking and withholding."   *Widgren*, 352 N.W.2d at 425 (citing Minn.
Stat. § 548.04).   The fact-finder assesses the value of the property and the damages that

the prevailing party sustained "by reason of the detention, or taking and withholding, of such property."  Minn. Stat. § 546.23 (2008).

In support of this remedy, B-Kam points to the following documents which it suggests provide superior claims of ownership than can be proven by defendants for the personal property remaining at the Floding Resort post-eviction:

- **Bill of Sale**:  Provides that for the sum of one dollar and other good and valuable consideration, defendants conveyed "any and all personal property utilized in the operation of Floding Resort . . . including but not limited to bedding, furniture, pots and pans, kitchen utensils, and wall hangings . . . ." (Pl.'s Trial Ex. 8.)  The Bill of Sale incorporates an inventory for each cabin documenting items that would also be part of the property conveyed.

- **Security Agreement**:  Provides that defendants grant to B-Kam a security interest in the collateral to secure the indebtedness.  The "collateral" includes in part "[a]ll . . . furniture, equipment, inventory, appliances, building supplies, materials, and any other personal property, now owned or hereafter acquired which is attached to, located in, placed in or necessary to the use and operation of the Floding Resort . . . including any replacements thereof or thereto."  (*Id.* Ex. 15.)  Per the agreement, B-Kam perfected the security interest through a UCC Financing Statement.  "Default" is defined in part as "[t]he borrower fails to make a lease payment or fails to pay any other sum which may be required . . . [t]he Borrower fails to make a payment . . . required to be made under the [Origination Fee] . . . ."  (*Id.*)

- 21 -

- **UCC Financing Statements**:  These statements, filed August 25, 2005, and September 5, 2008, cover the "collateral" from the Security Agreement.  (*Id.* Exs. 16-17.)

- **Order for Seizure of Property**: Directed the Sheriff of Douglas County, to seize the subject property at the Floding Resort, the subject property being largely the property described as "collateral" in the security agreement.  (*Id.* Ex. 38.)

The Court finds that the Bill of Sale, Security Agreement, UCC Financing Statements and Order for Seizure of Property, taken together, show that B-Kam has a superior claim to the personal property at the Floding Resort at the time defendants were evicted in 2008 than do defendants.

### C.      Affirmative Defenses

Defendants raise the affirmative defenses of unconscionability, estoppel, laches, wavier, unclean hands, failure to state a claim on which relief can be based, and lack of capacity to contract, to suggest that despite their failure to pay the monies owed under the various promissory notes, they should not be liable for those sums

Defendants' affirmative defenses do not preclude their liability for the above relief.  No aspect of the loans were unconscionable: both parties were represented by counsel (often multiple counsel) throughout the negotiations and completions of the various notes, and the terms of the notes, while providing a relatively high rate of interest, were a bargained for benefit.  *See Kauffman Stewart, Inc. v. Weinbrenner Shoe Co., Inc.,*

589 N.W.2d 499, 502 (Minn. Ct. App. 1999) ("A contract is unconscionable if it is such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." (internal quotation marks omitted) (citing *Hume v. United States*, 132 U.S. 406, 415 (1889))).  The fact that defendants later entered into contracts with far less favorable terms than those of the First and Second Cabin Construction Loans and the Origination Fee undermines any argument for unconscionability.

As discussed below, the doctrine of estoppel does not apply here.  The Court also finds that **no** evidence of laches, waiver, or unclean hands have been shown, much less proven.  *See Clark v. Reddick*, 791 N.W.2d 292, 294 (Minn. 2010) ("Laches is an equitable doctrine which applies to prevent one who has not been diligent in asserting a known right from recovering at the expense of one who has been prejudiced by the delay." (quotation marks omitted)); *Flynn v. Sawyer*, 272 N.W.2d 904, 909 (Minn. 1978) (citing *Johnson v. Freberg*, 228 N.W. 159, 160 (Minn. 1929) ("In order to invoke the equitable doctrine of unclean hands a claimant must demonstrate a bad motive or unconscionable conduct.")); *Ill. Farmers Ins. Co. v. Glass Serv. Co.*, 683 N.W.2d 792, 798 (Minn. 2004) ("The party alleging waiver must provide evidence that the party that is alleged to have waived the right possessed both knowledge of the right in question and the intent to waive that right.").

Though no motion to dismiss was brought, defendants' penultimate affirmative defense suggests that the complaint fails to state a claim upon which relief may be granted.  This defense fails, as the complaint sets out with specificity each harm suffered

by B-Kam, the amount of damages suffered as a result of the harm, and alleges more than sufficient facts, which, taken as true, state a claim that is plausible on its face. *Hastings v. Wilson*, 516 F.3d 1055, 1058 (8th Cir. 2008); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

Finally, defendants argue that Ruth Floding lacked capacity and was incompetent to sign the Warranty Deed in November 2004 conveying the Floding Resort to B-Kam, or was subjected to undue influence, thus the Warranty Deed should be declared void. *See Macklett v. Temple*, 1 N.W.2d 415, 438 (Minn. 1941) ("The rule as to the measure of the grantor's capacity to execute an instrument is simply that he must have enough to understand in a reasonable manner the nature and effect of what he is doing."); *see also Nelson v. Holland*, 776 N.W.2d 446, 451 (Minn. Ct. App. 2009) ("To prove undue influence, the evidence must establish not only that influence was exerted, but also that the influence was so dominant and controlling of the influenced party's mind that, in making the contract, the influenced party ceased to act of his or her own free will, becoming 'a mere puppet of the wielder of that influence.'" (quoting *In re Estate of Congdon*, 309 N.W.2d 261, 268 (Minn. 1981))). Though some testimony was offered, no evidence suggests that Ruth Floding's mental state met the very high bar necessary to demonstrate lack of capacity to contract. The medical records submitted by defendants suggest that at worst Ruth was confused for a period of time, which confusion lessened upon treatment of her "severe anemia." Testimony that Ruth at one time drove her manual transmission car for hundreds of miles in a single gear, thereby ruining the transmission, while probative of capacity, falls far short of proving that she lacked

capacity to contract at the time the Warranty Deed and other documents were executed. No evidence or testimony suggests undue influence in any way.  Defendants' affirmative defenses fail.

## II.  DEFENDANTS' COUNTER-CLAIMS

### A.  Breach

#### 1.  Anticipatory Repudiation

Defendants first asserted anticipatory breach or repudiation of the Floding Resort Lease's option to purchase during opening arguments at the bench trial on July 27, 2010. Defendants argued that Christensen's letter of August 15, 2008, in which he informed defendants' of B-Kam's termination of the lease due to multiple defaults, including nonpayment of rent, amounted to an anticipatory breach of the contract, thereby absolving them of performance.  Defendants also argue that B-Kam breached by failing to pay certain invoices required to be paid under the lease.   B-Kam objected to defendants' argument on the basis that it was not previously contained in defendants' counter-claim and thus should be barred from first being presented at trial.

The Court determines that whether anticipatory breach or repudiation could be appropriately raised at trial is immaterial, as the argument fails on its merits. "[A]nticipatory breach is the 'unconditional repudiation of a contract, either by words or acts, which is communicated to the other party prior to the time fixed for his performance[.]'"  *Dyrdal v. Golden Nuggets, Inc.* 689 N.W.2d 779, 785 n.4 (Minn. 2004) (second alteration in original); *see also Space Ctr., Inc. v. 451 Corp.*, 298 N.W.2d 443,

450 (Minn. 1980) (defining anticipatory breach as expressly renouncing performance of the contract and giving notice to the other party of the intent not to perform).

B-Kam did not repudiate the contract prior to when performance was due; instead, B-Kam terminated the contract according to its stated terms, long **after** performance was due.

Paragraph 16 of the Floding Resort Lease states:

The following events shall be deemed to be events of default by the Tenant under this lease . . . .  If the Tenant fails to pay any installment of monthly rent on the date the same is due and after written notice such failure shall continue for a period of five (5) days.

Paragraph 17 of the Floding Resort Lease states in part:

Upon the occurrence of any such events of default, the Landlord shall have the option to pursue any one or more of the following remedies upon 5 days written notice and demand.

    a.  Terminate the Lease, in which event the Tenant shall immediately surrender the premises to the Landlord . . . .

    h.  If Tenant, at any time shall fail to pay any taxes, assessments, or liens, or fail to make any payment or perform any act required by this Lease . . . the Landlord, without waiving or releasing the Tenant from any of its obligations or defaults under this Lease, may (but shall be under no obligation to) at any time thereafter make such payments or perform such act for the account of and at the expense of Tenant.

Paragraph 23 of the Floding Lease states:

As a further condition to the purchase of the Premises the Tenant shall be required to have paid the cabin construction promissory note and origination fee promissory note in full.  If the Tenant elects to purchase the Premises the Tenant shall give the landlord written notice of the Tenant's election . . . [and the] purchase of the Premises shall close within 15 days of the date of the Tenant's written notice to purchase the Premises.

Christensen sent defendants a letter on July 29, 2005, notifying them of their numerous defaults under the Floding Resort Lease, Origination Fee, and under the First and Second Cabin Construction Loans.   At the time of the letter, defendants owed principal sums of $108,500 in lease payments, $57,633.74 of the Origination Fee, $261,671.08 on the First Cabin Construction Loan, and the full sum, $165,000 on the Second Cabin Construction Loan.   Interest was also accruing on the loans through the entire period.   Christensen's letter stated" "Your failure to pay these sums in full as set forth in this letter before August 12, 2005, will result in B-Kam commencing [an] action against the two of you for the eviction of you from the [Floding Resort.]"  (Pl.'s Trial Ex. 40.)  Per the terms of the Floding Resort Lease, this notice triggered the five-day period to cure, after which if no payments were made, defendants would be in default.   It is undisputed that no payments were made in that five-day period.   Instead, defendants' attorney Roth sent an email with a copy of a loan approval document from Commonsense Mortgage, Inc.   Such approval was subject to a number of conditions, including a requirement of  sufficient funds to close which were not available at the time.

On August 15, 2005, Christensen sent a letter again detailing the various defaults under the loan, stating

> [T]his is to advise  you, Ruth Floding and Cora Floding . . . that B-KAM LLP, as landlord, has and does herewith elect to **terminate** the lease and your rights thereunder as tenants.   The Floding Resort Lease and your rights as tenants thereunder will terminate at <u>Midnight</u>, <u>August 22</u>, <u>2005</u>. B-Kam intends to take possession of the Premises . . . at 9:00 p.m., August 23, 2005.

(Pl.'s Trial Ex. 63.)  Defendant's attorney Roth's letter of August 19, 2005, stated that the Flodings intended to exercise the Option, and were in possession of the funds to do so. (*Id.* Ex. 64.)  Christensen responded by letter on August 23, 2005, stating that B-Kam had no intention of selling the real property to defendants.  (Pl.'s Trial Ex. 65.)  A question arises whether the lease terminated on August 15, when Christensen sent his second letter, on August 21, five days after notice was provided, or on September 2, fifteen days after defendants attempted to exercise the Option and failed to close.  The Court finds that regardless of whether defendants exercised the Option, and regardless of whether doing so somehow delayed the termination of the lease, as detailed below, **defendants were never able to close the transaction**.  Despite the termination of defendants' rights under the lease, B-Kam did not seek an order of eviction at that time, and defendants continued pursuing loans.  Even after B-Kam filed a notice of eviction, it agreed to postpone the eviction pending settlement discussions.

Thus, it is clear that the August deadlines had no bearing on defendants' **efforts** to obtain the required money for closing.  They continued attempting to acquire adequate funds to close the deal, but were unable to do so.  Defendants' argument that they did not attempt to close the purchase with B-Kam due to B-Kam's refusal to sell is unsupported by the facts.  Defendants **could not** have closed the purchase because the money was not even in Alexandria Title's escrow account until September 2, and the conditions for release of the money, including the ALTA survey, and the hundreds of thousands of dollars in costs, were not available.

Defendants' argument in its post-trial brief that Minnesota law allows a tenant the right, prior to an order of eviction, to pay delinquent rent plus costs to be restored to possession under the terms of the original lease is entirely unavailing.  Minnesota Statute 504B.291, subd. 1(b) provides in part

> If the tenant has paid to the landlord or brought into court the amount of rent in arrears but is unable to pay the interest, costs of the action, and attorney's fees required . . . , the court may permit the tenant to pay these amounts into court and be restored to possession within the same period of time . . . .

There is no question that defendants did not "pa[y] to the landlord . . . the amount of rent in arrears."  *Id.*  Defendants paid **none** of the amounts in arrears to B-Kam at that time, which was the reason Christensen wrote the July 29, 2005 letter in the first place.  Defendants did not tender rent payments before August 12, August 20, August 22, or within any reasonable time thereafter.

Defendants' argument that they should have been provided thirty days to cure after written notice of non-compliance is factually inaccurate, and irrelevant.  The provision defendants refer to, paragraph 16.b of the Floding Resort Lease,[1] does not supersede or counteract paragraph 16.a, which defines a default as failure to pay rent, or cure within five days of notice.  The Court notes that defendants also did not cure their default under 16.b within thirty days of notice.

---

[1] Paragraph 16 states: "The following events shall be deemed to be events of default by the Tenant under this lease . . . . [b.] If the Tenant shall fail to comply with any term, condition, or covenant of this Lease, other than the payment of Rent, and shall fail to cure its non-compliance with said term, condition, or covenant within thirty (30) days after written notice of said failure has been given to the tenant."  (Floding Resort Lease ¶ 16.b, Pl.'s Tr. Ex. 10.)

Therefore, the Court finds that B-Kam did not anticipatorily repudiate the Floding Resort lease, either expressly or implicitly.

### 2.    Rick Maras Invoices

As an additional ground on which defendants believe B-Kam breached some aspect of the Floding Resort Lease, defendants argue that B-Kam failed to pay Rick Maras' invoices.  Defendants' argument is essentially as follows: B-Kam committed to provide "as-needed" funding for the construction of new cabins, which were needed because defendants tore down the old cabins immediately prior to B-Kam agreeing to loan defendants the money to redeem the Sheriff's Certificate from Lee-Breitbach LLP. Maras, a friend of Cora Floding, undertook to build the cabins at a much lower rate than an outside contractor. Maras was close to finished with the cabins when he walked off the job in February 2005 for non-payment of certain invoices.  Maras' departure prevented the Floding Resort from hosting as many guests as it normally would during its busiest season, thus they could not earn the money to pay B-Kam the rent owed.

These arguments fail to suggest breach by B-Kam for a wide variety of reasons. Maras' original estimate for building the cabins was $464,800.  (Defs.' Trial Ex. 78.) The crux of defendants' argument is that B-Kam stopped paying Maras from the $263,000 First Cabin Construction Loan, so Maras walked off the job on February 15, 2005.  However, the First Cabin Construction Loan was provided on an "as-needed" basis, and all invoices to be paid were to be forwarded through Brown.  As of February 3, 2005, B-Kam had advanced $215,078, leaving only $47,922 un-advanced.  (Pl.'s Trial

Ex. 49.)  However Maras walked off the job twelve days later asserting he was owed $146,447.13.  (Defs.' Trial Ex. 79.)  Thus, even if the other $47,922 had been requested through Maras' invoices, he would still have been owed more than $98,000.  Clearly, defendants anticipated paying some of Maras' costs themselves, or they would have sought a larger loan.[2]  Further, B-Kam notes that it was not contractually obligated to pay Maras' invoices ahead of any other bills, and it is reasonable that even if B-Kam had paid the remainder of the money it agreed it would provide on an "as-needed" basis, Maras would have walked off due to the $98,000 shortfall.

Though defendants allege that B-Kam did not pay some of the invoices forwarded to it by Brown, Tim Christian testified that B-Kam paid every invoice given to them by Brown, and no evidence suggests that Brown sent B-Kam an invoice that went unpaid.  Any money remaining as part of the First Construction Loan presumably would have been paid if Maras had stayed and finished his work.

B-Kam has offered a variety of reasons that the remaining money was not provided after Maras walked off, perhaps most relevantly a communication from Brown on June 6, 2005 in which he asked for $12,500 to be wired to him, thus "[t]his will leave a balance of $21,500.00 [still to be provided by B-Kam of the Second Cabin Construction Loan of $165,000].  We should save this in case we need it for the title work."  (Pl.'s Trial Ex. 58.)  B-Kam also apparently withheld money due to a mistaken belief that some of the money was being used to add improvements to the Flodings' residence.  Though

---

[2]  The $165,000 Second Cabin Construction Loan was not requested until May 2005, three months after Maras walked off the job.  (Pl.'s Trial Ex. 18.)

the facts are murky surrounding exactly what money, if any, was used to improve the residence, the answer is inconsequential: there is no evidence B-Kam failed to pay any invoice it was provided, and B-Kam was not obligated to pay Maras' invoices to the exclusion of other bills.

Ultimately, defendants' argument fails both for a lack of evidence supporting their conclusion, and for attempting to prove too much. Though Maras was sending invoices that appear not to have been paid, there is no evidence suggesting this was a result of any withholding by B-Kam. Further, the Court will not infer a direct correlation between a failure to provide $47,922 and defendants' total inability to make lease payments. Brown testified that after conducting a cash-flow projection on defendants' assets, in his opinion they had enough income to cover some payments on the Floding Resort Lease, or at least pay for contractors to finish the work Maras quit. (Defs.' Trial Ex. 4.) The Court finds that no breach has been shown by any actions of B-Kam towards Maras.

### 3.   Inability to perform

Even if the Court were to find that Christensen's August 15 letter did not terminate the Floding Resort Lease, the facts demonstrate that defendants did not have the funds available to purchase the premises, and in fact never received the necessary funds to do so, despite working with two different loan companies. Though at least $2,000,000 was deposited into Alexandria Title's escrow account, the money was not available for the defendants to use until they met certain conditions.   These conditions included

procurement of an ALTA survey, and payment of more than $200,000 in closing costs, which Schimek testified she never received, nor did she believe defendants possessed.

Defendants' claims that Cora had sufficient funds available to cure defaults under the lease, pay off the B-Kam promissory notes, and pay the $1,200,000 purchase price, is not true, unless there was some other reserve of money never brought forward.   At no time did defendants cure the various defaults, because at no time did defendants tender to Schimek, Commonsense Mortgage, Inc., or SCI, the requisite closing costs and settlement fees.   Despite receiving a "loan approval" defendants were never realistically in a position to receive the money and use it to exercise the Option contained in the Floding Resort Lease.   Defendants' arguments to the contrary notwithstanding, they did not have, or if they did, they never tendered, sufficient funds to obtain the loan from SCI, as further demonstrated by the continued failure to pay rent or judgments over the following three years before a second order of eviction was executed.

Defendants also argue that a party to a contract cannot rely on the occurrence or non-occurrence of a condition as a breach of a contract when that party caused the occurrence or non-occurrence.   *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 501 (Minn. 1995).   This argument is raised in support of defendants' claim that B-Kam's failure to provide all of the funds borrowed led to defendants' inability to finish the cabins and receive rental payments.   However, B-Kam did not cause defendants' inability to consummate the Option within fifteen days after the notice of intent to purchase on August 19, 2005.   Defendants themselves failed to meet their

lender's requirement of an ALTA survey and proffering sufficient funds to close the loan arrangement and receive the proceeds.

## B.    Equitable Mortgage

Defendants persist, in the face of multiple court rulings to the contrary, that an equitable mortgage existed between B-Kam and defendants.   The Court will not readdress this issue here, noting instead its previous ruling in which the Court stated:

> [T]he Flodings intended to release their equitable mortgage claim.  Indeed, that was expressly verified on the record.  In addition, the Flodings have conceded they received sufficient consideration in exchange for this release . . . .  The Court [also] notes that the Flodings were represented by Counsel at the time of the release and had the opportunity to review and amend the settlement terms after the hearing.  No changes were made to those terms that impacted their release of their equitable mortgage claim.

(Order, Sept. 4, 2008, Civ. No. 08-4233, Docket No. 20.)  Defendants have alleged no new facts suggesting that this or other courts' previous rulings were in any way incorrect, or that the settlement agreement is not binding.

## C.    Promissory and Equitable Estoppel

Defendants' next counter-claim alleges that they relied on B-Kam's promise of a mortgage loan to their detriment, when B-Kam had the present intent to make a mortgage loan.  The application of promissory estoppel requires three elements: (1) a clear and definite promise; (2) the promisor intended to induce reliance, and such reliance occurred; and (3) the promise must be enforced to prevent injustice.  *Olson v. Synergistic Techs. Bus. Sys., Inc.*, 628 N.W.2d 142, 152 (Minn. 2001).   There are two approaches to promissory estoppel, one restrictive, one expansive.  In the restrictive view, promissory

estoppel implies a contract in law where none in fact exists. *Sacred Heart Farmers Co-op. Elevator v. Johnson*, 232 N.W.2d 921, 923 n.1 (Minn. 1975). The expansive view takes a contract out of the statute of frauds when the promise relied upon is a promise to reduce the contract to writing. *Lunning v. Land O'Lakes*, 303 N.W.2d 452, 459 (Minn. 1980). The restrictive view is not relevant here because contracts did exist: the Floding Resort Lease, Warranty Deed, and other documents whereby B-Kam agreed to provide the necessary funds for defendants to redeem the Sheriff's Certificate.

Utilizing the expansive view, the Court evaluates whether a promise existed to reduce a contract to writing. No such promise has been shown here. Brown testified that B-Kam never promised to make a mortgage loan. Indeed, the entire premise of defendants' promissory estoppel argument seems to be that B-Kam received a draft mortgage loan agreement. However, Christensen testified that he, in consultation with the principals of B-Kam, nearly immediately rejected the idea of a mortgage due to the consequences of structuring the transaction as a mortgage and given B-Kam's goals to keep the duration of the investment limited. In fact, the Commercial Loan Write-Up appears to have simply been a document sent to B-Kam, which elected to do nothing with it. Cora Floding even admitted in her testimony that she had nothing in writing suggesting that B-Kam promised to make a mortgage loan. No other documents or evidence aside from Cora Floding's testimony exists to suggest a **promise** of a mortgage loan, much less a commitment. As such, defendants' counter-claim for promissory estoppel fails.

Because there was no representation, through acts, language, or silence, that a mortgage loan would be made, defendants' counter-claim for equitable estoppel also fails. *See Lunning*, 303 N.W.2d at 457 ("[T]he doctrine of equitable estoppel may limit the application of the Statute of Frauds . . . . When an application of the Statute will protect, rather than prevent, a fraud, equity requires that the doctrine of equitable estoppel be applied . . . [factors include] conduct[,] acts language[,] or silence amounting to a representation or a concealment of material facts." (citations omitted)).

### D.    Misrepresentation

Defendants' fourth and fifth counter-claims allege negligent misrepresentation and misrepresentation in connection with B-Kam's alleged representation that it had the present intent to make a mortgage loan.  "[T]he elements of [the tort of negligent misrepresentation] are: (1) a duty of reasonable care in conveying information; (2) breach of that duty by negligently giving false information; (3) reasonable reliance on the misrepresentations, which reliance is the proximate cause of physical injury; and (4) damages."  *Smith v. Brutger Cos.*, 569 N.W.2d 408, 413 (Minn. 1997) (quoting Restatement (Second) of Torts § 311 (1965)). As the analysis of estoppel above demonstrates , B-Kam made no promise, or representation that it would make a mortgage loan.  Further, B-Kam took no actions that would reasonably lead defendants to believe a mortgage loan was forthcoming.  Defendants' post-trial brief makes no mention of the claims for misrepresentation, or negligent misrepresentation.  Because no facts have been proven suggesting any misrepresentation or false information in connection with a

mortgage loan, defendants' counter-claims for misrepresentation and negligent misrepresentation fail.

### E.    Specific Performance

Defendants' also seek specific performance of the Floding Resort Lease and the Purchase Agreements for Parcels A and B. Specific performance is a purely equitably remedy "addressed to the sound discretion of the trial court." *Flynn v. Sawyer*, 272 N.W.2d 904, 910 (Minn. 1978). "A party does not have an automatic right to specific performance as a remedy for breach of a contract; the district court must balance the equities of the case and determine whether the equitable remedy of specific performance is appropriate." *Dakota Cnty. HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999).

Defendants assert that the Floding Resort Lease is an enforceable contract. Though this was the case during the lifetime of the Floding Resort Lease, that lease ended due to the 2006 Eviction Action. Because no contract exists, and because B-Kam has already sold the Floding Resort, specific performance is not appropriate and will not be granted. Additionally, a balancing of the equities does not weigh in defendants' favor, since they were provided many opportunities over nearly seven years to purchase their resort, yet failed to pay rent or keep any of their obligations under the various agreements they signed.

Defendants also argue that the Purchase Agreements for Parcels A and B, signed by Floding Resort 1, LLC and Floding Resort 2, LLC, are enforceable contracts which B-Kam breached by refusing to re-sell the Parcels to defendants. Both purchase agreements

contain the following language: "Time of Essence: Seller and Buyer agree that **Time Shall Be Of The Essence** of this Agreement.  If the Buyer fails to complete its purchase of the Property by **3:00 p.m. (P.S.T.)**, on **May 8, 2007**, this Agreement shall be **VOID**." (Pl.'s Tr. Exs. 28-29.)  Subsequent amendments extended the date for closing to June 1, 2007, however neither purchase agreement was fulfilled, and the time for doing so has long since passed.  Specific performance will not be ordered as to Parcels A and B.

### F.      Foreclosure Purchaser Statute

Defendants' bring counter-claims under the "Foreclosure Purchaser Statute," alleging that they were "foreclosure homeowners," that B-Kam was a "foreclosure purchaser," and that the transaction between B-Kam and defendants was a "foreclosure reconveyance."  Under the statute, a "foreclosed homeowner" is defined as "an owner of residential real property, including a condominium, that is the primary residence of the owner and whose mortgage on the real property is or was in foreclosure."  Minn. Stat. § 325N.10, subd. 2.  At the time of the events the subject of this action, a "foreclosure purchaser" was "a person that has acted as the acquirer in more than one foreclosure reconveyance during any 24–month period."  *Id.* subd. 4. (2004).  A "foreclosure reconveyance" was a transaction involving the transfer of title of real property by a foreclosed homeowner, and a reconveyance or promise of a subsequent conveyance of an interest back to the foreclosed homeowner by the acquirer.  *Id.* subd. 3.

During the events giving rise to this lawsuit, defendants were not owners of residential real property, but were instead owners of commercial property, namely, a

commercial resort that the Douglas County Treasurer and Douglas County Assessor characterized as "commercial non-homestead" and as "farm non-homestead." (Pl.'s Trial Ex. 39.) However, even assuming *arguendo* that the Floding Resort could be considered residential real property because the Flodings lived on it for some part of the year, there is no evidence that B-Kam was a "foreclosure purchaser" as defined in the statute. No evidence suggests that B-Kam or any of its principals acted as an acquirer in more than one foreclosure reconveyance in a twenty-four month period.

Finally, even if the foreclosure purchaser statute was applicable, the four-year statute of limitations has expired with respect to defendants' claims for exemplary damages under § 325N.18, subd. 2. The Warranty Deed was signed and delivered by Ruth Floding on November 29, 2004, and defendants' counterclaim is dated December 8, 2008, and was filed with the Court on December 9, 2008. (Docket No. 11.) Defendants' have not proven their claim for a violation of the foreclosure purchaser statute.

### G. Violation of Statute Protecting the Elderly and Handicapped

Defendants allege a variety of violations of Minnesota law and seek rescission of the 2004 transaction between defendants and B-Kam, or a money judgment for damages in excess of $50,000, for conduct perpetrated against a senior citizen or handicapped person. *See* Minn. Stat. § 325F.71. In order to recover under Minn. Stat. § 325F.71, defendants must show that B-Kam engaged in conduct constituting a deceptive trade practice, Minn. Stat. § 325D.43-48, engaged in false advertising, Minn. Stat. § 325F.67, or engaged in consumer fraud, Minn. Stat. § 325F.68-70. Because the Court finds that,

similar to the estoppel analysis, no false statements, fraud, disparagement, deception, or misrepresentations were made by B-Kam to Ruth Floding or any other defendants, defendants' eighth counter-claim fails.[3]

### H.    Fraudulent Inducement

For the reasons that defendants' counter-claims for promissory and equitable estoppel, and negligent misrepresentation and misrepresentation fail as described above, defendants' counter-claim for fraudulent inducement also fails.

## III.    ATTORNEY'S FEES

In addition to damages, B-Kam has asked for relief in the form of attorney's fees, costs, and disbursements owing pursuant to the three promissory notes executed by defendants in favor of B-Kam.  In general, each party is liable for its own attorney's fees, unless otherwise provided by statute or allocated by contract.  *Borntrager v. Cent. States Se. & Sw. Areas Pension Fund*, 577 F.3d 913, 924 (8th Cir. 2010).   Each of the promissory notes at issue in this case contains the following language:

> **Lender Rights:** Borrower also will pay Lender the amount incurred by the Lender to collect this Note, which amount will be subject to any limits under applicable law, Lender's reasonable attorney's fees and legal expenses whether or not there is a lawsuit, including reasonable attorney's fees [for] appeals, and any anticipated post-judgment collection services.

(Pl.'s Trial Exs. 11, 14, 18.)  B-Kam has not cited any statute allotting attorney's fees in a case like this one, thus the Court relies on the contractual language to assess the propriety

---

[3] Defendants' have titled both their eighth and ninth counter-claims "Count Eight."  This discussion refers to the first of the two.

of attorney's fees.  Here, B-Kam has spent nearly six years in various stages of litigation with defendants, including at least two eviction actions and a bench trial, to recover the value of the bargained-for benefits of three promissory notes.  Applying the contractual language, the Court assesses reasonable attorney's fees, costs, and disbursements required to collect the proceeds of the notes, against defendants.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Judgment is entered in favor of plaintiff and against defendants.

2.      Defendants are **ORDERED** to remit to B-Kam, LLP, $625,817.77 as the damages accrued through September 5, 2008.  The Court further **ORDERS** that within thirty (30) days of this Order, plaintiff shall submit an affidavit(s) setting forth the amount of additional interest owed on the three promissory notes. Defendants may respond within thirty (30) days after receipt of the plaintiff's submission.

3.     Defendants are **ORDERED** to remit to B-Kam, LLP, all property described as "Collateral" by the UCC Financing Statements still remaining at the Floding Resort as of September 4, 2008.

4.     Defendants' counterclaims [Docket No. 11] are **DENIED** in their entirety.

5.     Within thirty (30) days from the date of this Order, plaintiff shall submit an affidavit(s) and other supporting memorandum setting forth the attorney's fees and costs

it expended prosecuting this lawsuit.  Defendants may respond within thirty (30) days after receipt of the plaintiff's submission.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 30, 2011                                   s/ John R. Tunheim
at Minneapolis, Minnesota.                               JOHN R. TUNHEIM
                                                         United States District Judge